1            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF TEXAS
2                HOUSTON DIVISION

3

4 UNITED STATES OF AMERICA    *   Criminal No. H-16-3
                          *
5 VERSUS                  *   Houston, Texas
                          *   January 13, 2016
6 OMAR FARAJ SAEED AL HARDAN   *   4:00 p.m.

7

8                  DETENTION HEARING
        BEFORE THE HONORABLE LYNN N. HUGHES
9           UNITED STATES DISTRICT JUDGE

10 For the Government:

11       Mr. Ralph Edward Imperato
       Mr. Mark McIntyre
12       Office of the U.S. Attorney
       1000 Louisiana
13       Suite 2300
       Houston, Texas 77002
14

15 For the Defendant:

16       Mr. David Adler
       David Adler PC
17       6750 W Loop South
       Suite 120
18       Bellaire, Texas 77401

19

20 Court Reporter:

21       Fred Warner
       Official Court Reporter
22       515 Rusk Ave.
       Houston, Texas 77002
23

24 Proceedings recorded by mechanical stenography, produced by
computer aided transcription.
25

Appearances:

Also Present:

       Official Court Interpreter

1                          I N D E X

2

3      WITNESS                                          PAGE

4

5   HERMAN ALBERT WITTLIFF

6      Direct Examination    (By Mr. Imperato)        12
       Cross-Examination     (By Mr. Adler)           44
7      Redirect Examination  (By Mr. Imperato)        64

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  Thank you.  Please be seated.

2         First, for those of you who may have been in

3    the audience earlier, there was confusion.  At about 2:00

4    o'clock, 1:30 something I met with the government lawyers and

5    Mr. Al Hardan's lawyer to discuss confidentiality of

6    information; and we had a friendly chat about that; nothing

7    happened.

8         And then right after that the grand jury

9    returned and they had several indictments that needed to be

10   sealed because the people were fugitives; and we try not to

11   alert them, and so that's why we ran whoever was here off.

12   So, sorry about that.

13        The government has proposed Exhibits 1 through

14   9, and they are admitted.

15        Mr. Adler already had not objected.  I wasn't

16   skipping him.

17        United States of America versus Omar Faraj

18   Saeed Al Hardan.

19        MR. IMPERATO:  Good afternoon, Your Honor.  Ted

20   Imperato and Mark McIntyre for the United States.

21        MR. McINTYRE:  Good afternoon.

22        MR. ADLER:  David Adler for Mr. Hardan, Your Honor.

23        THE COURT:  So shall we proceed and arraign him?

24        MR. IMPERATO:  Yes, Your Honor.  We can do that.

25        THE COURT:  Would you raise your right hand.

Ma'am, does he speak no English?

MR. ADLER:  He is more comfortable with the interpreter, Your Honor.

THE COURT:  That's a different question.

All right.  Mr. Adler.

MR. ADLER:  He speaks some English, Your Honor.

THE COURT:  You need to translate what I say to him and what he says to me, and you can't transliterate it.  I don't want it broken in Arabic or broken English, but as close as you can possibly come to exactly what he says.  And if he asks you a question, you have to tell me what he asks you.

THE INTERPRETER:  Yes, sir.

THE COURT:  If I tell you something, then you tell him.  I want him to hear everything that happens in the courtroom.

THE INTERPRETER:  Yes, Judge.

THE COURT:  You have to even interpret what the government lawyers say.

THE INTERPRETER:  Yes, Judge.

THE COURT:  All right.  Mr. Hardan, do you solemnly swear that the testimony you give will be the truth, the whole truth and nothing but the truth?

THE DEFENDANT:  Yes.

THE COURT:  All right.  You may put your hand down.

Tell me your full name, please, sir.

THE DEFENDANT:  Omar Faraj Saeed Al Hardan.

THE COURT:  All right, ma'am.  You need to use the microphone.  She can hear him.

THE DEFENDANT:  Omar Faraj Saeed Al Hardan.

THE COURT:  But she is going to do most of the talking.

THE INTERPRETER:  Omar Faraj Saeed Al Hardan.

THE COURT:  Shove him out of the way a little bit. No, you get close to the microphone.  Those people, even the one who is speaking Arabic, can presumably hear the English translation.  So you speak right into the microphone like Britney Spears and speak clearly so everybody can hear what he says.

THE INTERPRETER:  Yes, Judge.

THE COURT:  I'll do it like George Clooney, okay.

How old are you?

THE DEFENDANT:  24 years old.

THE COURT:  How many years of education have you had?

THE DEFENDANT:  11.

THE COURT:  And where did you do that?

THE DEFENDANT:  In Jordan.

THE COURT:  Did you study English there?

THE DEFENDANT:  No.

1          THE COURT:  Any chemistry or physics?

2          THE DEFENDANT:  The science, yes.

3          THE COURT:  Of what country are you a citizen?

4          THE DEFENDANT:  Palestine.

5          THE COURT:  And do I correctly understand, though,

6     you don't have a Palestinian Authority passport?

7          THE DEFENDANT:  I don't have it.  I don't have it.

8          THE COURT:  Did you ever have one from them?

9          THE DEFENDANT:  I was young in Jordan.  I do not

10    know if they issued that for me or not.

11         THE COURT:  Have you been under the care of a

12    physician or a psychologist lately, like five years?

13         THE INTERPRETER:  Excuse me, Judge.  Could you

14    please repeat?

15         THE COURT:  A physician or a psychologist.

16         THE DEFENDANT:  No.

17         THE COURT:  Were you using drugs or alcohol?

18         THE DEFENDANT:  No.

19         THE COURT:  How do you feel today?

20         THE DEFENDANT:  Stressed.

21         THE COURT:  Stressed?

22         THE DEFENDANT:  (Indicating in the affirmative).

23         THE COURT:  You're surrounded by lawyers.

24              Have you had an opportunity to discuss your

25    case with Mr. Adler?

1          THE DEFENDANT:  Yes.  I had the opportunity.

2          THE COURT:  Are you satisfied with the work that he

3   has done for you?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Mr. Al Hardan, there are three charges

6   against you in this indictment from the grand jury.  Has Mr.

7   Adler gone over the indictment and the nature of the

8   offenses?

9          THE DEFENDANT:  Yes.

10          THE COURT:  Do you want me to read it to you now?

11          THE DEFENDANT:  Yes.

12          THE COURT:  You are charged on October 15th, 2004 --

13   wait a minute.

14          MR. ADLER:  Judge, ordinarily we just waive the

15   reading, formal reading; and if I can have a second to

16   confirm that with him.

17          THE COURT:  I am happy to chat with him about them;

18   but as you know, there are multiple pages of turgid prose

19   that are --

20          MR. ADLER:  If you give me just a second.

21          THE COURT:  -- not written by normal people.

22

23          (Mr. Adler confers with defendant)

24

25          THE DEFENDANT:  I want to tell the Judge that I am

okay without reading it.

THE COURT:  Okay.  You understand in Count 1 the charge says that you provided important support to a foreign terrorist or terrorist organization.

Count 2 charges that you procured your citizenship or naturalization unlawfully.

And Count 3 says that you lied to a representative, as I recall, of Immigration.

MR. IMPERATO:  Homeland Security, Your Honor.

THE COURT:  That's everybody.

Anyway, a government officer.  You lied to a government officer.

THE DEFENDANT:  I understand the charges.

THE COURT:  All right.  The punishment for the material support to terrorists is imprisonment up to 15 years, but there is no charge of death.

MR. IMPERATO:  Judge, it's a maximum penalty of 20 years.

THE COURT:  Did they raise that?  There is no claim that there was a direct death.

MR. IMPERATO:  No, Your Honor.

THE COURT:  For the naturalization fraud, check this, 10 years to fit the first offense.

MR. IMPERATO:  Because there is a terrorism enhancement, it's a maximum of 25 years, Your Honor.

1    THE COURT:  I was going to work up.  15 years if

2  it's connected to another offense, period, and 25 years if

3  it's connected to or facilitated terrorism.

4         The false statement later is up to eight years

5  imprisonment if it's connected to terrorism and five if it's

6  not.  Is that right?

7    MR. IMPERATO:  It's eight years, Your Honor; you're

8  correct.

9    THE COURT:  Mr. Al Hardan, how do you plead to Count

10  1 of the indictment of aid to terrorist organization?

11    THE DEFENDANT:  I'm not guilty.

12    THE COURT:  How do you plead to Count 2, the

13  procuring your citizenship status or your immigration status

14  by fraud?

15    THE DEFENDANT:  I'm not guilty.

16    THE COURT:  And how do you plead to misrepresenting

17  facts intentionally to government officers about your

18  immigration status?

19    THE DEFENDANT:  I am not guilty.

20    THE COURT:  Now, I've heard that he has consented to

21  waiving the Speedy Trial Act.

22    MR. ADLER:  Because of the volume of materials,

23  Judge, we would waive the Speedy Trial Act.

24    THE COURT:  Well, all right.  Now, that does not,

25  however, mean that we're going to delay this.

1    MR. ADLER:  I understand.

2    THE COURT:  If it turns out that it truly is

3 necessary, then we will based on that; but at the moment I'm

4 entering a scheduling order that follows the speedy trial

5 limits.

6         What is the government's position on whether he

7 should be released or held pending a trial?

8    MR. IMPERATO:  Your Honor, the government moves for

9 detention based on the presumption that the defendant is a

10 risk of flight and danger to the community.

11    THE COURT:  And not the nature of the offense?

12    MR. IMPERATO:  Well, that's the presumption in Count

13 1, the nature of the offense.

14    THE COURT:  Mr. Adler.

15    MR. ADLER:  Yes, Your Honor.

16    THE COURT:  Does he accede to that or does he want a

17 bond?

18    MR. ADLER:  We would like to have a hearing, Your

19 Honor.

20    THE COURT:  Then why don't you sit and we will

21 proceed.

22    MR. IMPERATO:  Your Honor, the government would call

23 Herman Albert Wittliff to the stand.

24    THE COURT:  Will you raise your right hand.

25         Do you solemnly swear that the testimony you

give will be the truth, the whole truth and nothing but the

truth?

THE WITNESS:  I do.

THE COURT:  Sit there, speak right into the

microphone, please, sir.

Mr. Imperato.

MR. IMPERATO:  Thank you, Your Honor.

HERMAN ALBERT WITTLIFF

was called as a witness by the government and,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. IMPERATO:

Q   Can you please state your name and spell your first and

last name for the record.

A   My name is Herman Albert Wittliff, Herman, H-e-r-m-a-n,

W-i-t-t-l-i-f-f.

Q   Where are you employed, sir?

A   I'm a Special Agent with the Department of Homeland

Security, Homeland Security Investigations.

Q   How long have you been employed in that capacity?

A   Just over five-and-a-half years.

Q   Do you have any other prior law enforcement experience?

A   I do.  I spent eight years as a Special Agent with the

U.S. Department of State's Diplomatic Security Service.

Q   And where were you assigned in that capacity?

1  A    A variety of different locations to include Iraq;

2  Washington, D.C., Houston.

3  Q    What's your present assignment?

4  A    I'm a Task Force officer assigned to the Houston FBI

5  Joint Terrorism Task Force.

6  Q    How long have you been serving in that capacity?

7  A    Just over a year-and-a-half.

8  Q    Do you see the defendant, Mr. Omar Al Hardan, seated in

9  the courtroom this afternoon?

10  A    I do.

11  Q    Could you, please, point him out and indicate what he's

12  wearing for the record.

13  A    He's right over there, and he's wearing an olive drab

14  jumpsuit.

15          MR. IMPERATO:  Indicating the defendant for the

16  record, Your Honor.

17          MR. ADLER:  No objection.

18          THE COURT:  He's seated between Mr. Adler and the

19  interpreter.

20          MR. IMPERATO:  Thank you, Your Honor.

21  BY MR. IMPERATO:

22  Q    The activities that you're to testify about today, did

23  they occur in Houston, the Southern District of Texas?

24  A    Yes, they did.

25  Q    And can you tell the Court when did the FBI investigation

1  of Mr. Al Hardan, when did it begin?

2  A    In April of 2014.

3  Q    And was the defendant in contact with an individual named

4  Mr. Aws Al-Jayab?

5  A    Yes, he was.

6  Q    Can you spell Al-Jayab for the record.

7  A    A-l-j-a-y-a-b.

8  Q    Who is Mr. Aws?

9  A    He is the subject of an ongoing Joint Terrorism Task

10 Force investigation in Sacramento, California.

11 Q    Does he still reside in California?

12 A    Yes, he does.

13 Q    How did Mr. Al Hardan and Mr. Aws communicate?

14 A    They used Facebook Messenger.

15 Q    Can you tell the Court the period of time that these two

16 individual were communicating?

17 A    They were communicating from April of 2013 until October

18 of 2014.

19 Q    What foreign terrorist organization was Mr. Al-Jayab

20 associated with?

21 A    Al-Husrah Front and Islamic State in Iraq and Levant,

22 commonly called ISIL.

23         MR. IMPERATO:  Judge, may we refer to it as ISIL for

24 the purposes of this proceeding?

25         THE COURT:  Yes, sir.

1          MR. IMPERATO:  Thank you.

2  BY MR. IMPERATO:

3  Q   And are these groups, are these designated foreign

4  terrorist organization as designated by the United States

5  Department of State?

6  A   Yes, they are.

7          THE COURT:  Now it's your turn, Mr. Imperato.  Pull

8  that microphone, speak right into it.  Those people are

9  straining themselves.  Raise it a little bit.  You're a

10  little taller than the interpreter.  There you go.

11          MR. IMPERATO:  How is that?

12          THE COURT:  There you go.  Right into it.

13  BY MR. IMPERATO:

14  Q   How did Mr. Al-Jayab and the defendant, how would they

15  refer to these foreign terrorist organizations?

16  A   The "front," the "state" and collectively the "brothers."

17  Q   And based on your training and experience, is that how

18  they're commonly referred to?

19  A   Yes.

20  Q   Did Mr. Al-Jayab describe to the defendant any previous

21  trips that he had taken?

22  A   Yes, he did.

23  Q   What did he say?

24  A   He said that --

25  Q   What did he message?

1 A    He messaged that he had traveled to Syria previously to

2 participate in fighting, killing, to include using weapons

3 such as silenced weapons and participated in three

4 executions.

5 Q    Who did Mr. Al-Jayab say he was fighting with?

6 A    ISIL.

7 Q    Did the defendant, Mr. Al-Jayab --

8        THE COURT:  Wait a minute.  That's an ambiguous

9 question.  If you're fighting with your wife, are you

10 fighting your wife or are you fighting somebody else with

11 her?

12 BY MR. IMPERATO:

13 Q    Who was he fighting for?

14        THE COURT:  Who were they telling?

15        THE WITNESS:  He was fighting alongside or working

16 with ISIL killing civilians and people in Syria.

17        MR. IMPERATO:  Thank you.

18 BY MR. IMPERATO:

19 Q    Did the defendant and Mr. Al-Jayab discuss any future

20 plans to travel?

21 A    Yes, they did.

22 Q    What did they discuss?

23 A    That they both wanted to travel back to Syria to join

24 with ISIL to fight against the competing forces.

25 Q    What was this defendant -- what did he message Mr.

1  Al-Jayab?  What was he waiting for?

2  A    He was waiting for his U.S. passport.

3  Q    Did the defendant end up going to Syria?

4  A    He did not.

5  Q    Why not?

6  A    He didn't have a U.S. passport to travel on.

7  Q    Did Mr. Al-Jayab inform the defendant as to whether he

8  returned to Syria?

9  A    Yes, he did.

10  Q    And what did he say?  What did he message Mr. --

11         MR. ADLER:  I object what Mr. Aws does or Mr.

12  Al-Jayab does in Sacramento is really not relevant to this

13  Court's determination today.

14         THE COURT:  Overruled for a moment.

15             Do we know that he left?

16         THE WITNESS:  Yes.

17  BY MR. IMPERATO:

18  Q    What did Mr. Al-Jayab message the defendant?

19  A    That he was going to travel back over to Syria and

20  participate fighting alongside ISIL.

21         THE COURT:  Did he go?

22         THE WITNESS:  Yes, sir.

23         THE COURT:  Let's cut to the meat of it.

24         MR. IMPERATO:  Well, it's what he said, Your Honor.

25  It's Al-Jayab's words.

1    THE COURT:  And he got there, and did he send

2  messages back after he got there?

3    THE WITNESS:  He did not.  They did not communicate

4  while he was there.

5  BY MR. IMPERATO:

6  Q    Did the defendant and Mr. Al-Jayab discuss any attacks

7  that were taking place in United States?

8  A    Yes, they did.

9  Q    What did they discuss?

10 A    They spoke about the Fort Hood shooting and the Boston

11 Marathon bombing.

12 Q    Can you tell the Court, what is the defendant's status in

13 the United States?

14 A    He's a legal permanent resident.

15 Q    Is he a United States citizen?

16 A    He is not a U.S. citizen.

17 Q    What is a legal permanent resident?

18 A    That is someone who is allowed to live in the United

19 States in a permanent capacity, but they don't have the full

20 rights and privilege of U.S. citizenship.

21 Q    Is he able to get a passport?

22 A    He is not, not a U.S. passport.

23 Q    Did the defendant attempt to become a United States

24 citizen?

25 A    Yes, he did.

1 Q   And how did he do so?

2 A   By applying for naturalization.

3 Q   And did he have to fill out any type of form?

4 A   Yes, he did.  He filled out an N-400, which is an

5 application for naturalization for U.S. citizenship.

6 Q   When did the defendant fill out the N-400?

7 A   August of 2014.

8 Q   I want to direct your attention to Question 10 on the

9 N-400.  Are you familiar with that question?

10 A   Yes.

11 Q   What is that question?

12 A   If there has been any contact or association with any

13 terrorist organization.

14 Q   And what did the defendant respond to that question?

15 A   No.

16 Q   Is that a correct response?

17 A   It is not.

18 Q   Why is that incorrect?

19 A   He, in fact, had been in touch with people who were

20 linked to Al-Nusrah Front and ISIL.

21 Q   Over the course of your Federal Bureau of

22 Investigation -- over the course of their investigation, did

23 the defendant make any unusual purchases that concerned law

24 enforcement?

25 A   Yes, he did.

1  Q    What was the defendant purchasing?

2  A    He was purchasing electronic circuitry components.

3  Q    What types of electronic components?

4  A    Transistors, 9-volt battery connectors, light resistors

5  and remote controls.

6  Q    Was it wireless remotes?

7  A    Wireless remotes.

8  Q    When did the defendant being purchasing these items?

9  A    May of 2014.

10 Q    And did the defendant make one purchase or multiple

11 purchases?

12 A    Multiple purchases.

13 Q    How was the defendant purchasing these electronic

14 components?

15 A    On eBay.

16 Q    Why did these purchases cause law enforcement concern?

17 A    These components are consistent with transmitter/receiver

18 detonators that are used on improvised explosive devices that

19 have been used in Iraq and Afghanistan.

20 Q    Was an FBI explosives expert consulted about these

21 electronic components that were purchased?

22 A    Yes.

23 Q    And based on the training and experience of the FBI

24 explosives expert, do they have an opinion as to what these

25 components were being used for?

1  A   Yes.

2  Q   And what is that opinion?

3  A   To make transistor -- to make transmitter/receiver

4  detonators for improvised explosive devices.

5           THE COURT:  What else could they make out of them?

6           MR. IMPERATO:  That's where I was going.

7  BY MR. IMPERATO:

8  Q   What are they consistent with?

9  A   They are consistent with those detonators.

10 Q   And consistent with anything that was used in a foreign

11 country?

12 A   Consistent with detonators that have been used in the

13 wars in Iraq and Afghanistan.

14          THE COURT:  Wouldn't they be consistent with garage

15 door openers?

16          THE WITNESS:  Yes, sir.

17 BY MR. IMPERATO:

18 Q   Did the defendant have any conversations with a

19 confidential human source?

20 A   Yes, he did.

21 Q   Approximately how many?

22 A   17.

23 Q   When did these meetings begin?

24 A   They began in June of 2014.

25 Q   Can you tell the Court what the defendant and the

 1  confidential human source, what was the consistent theme?
 2  What did they discuss during these meetings?
 3  A    Talking about supporting ISIL both from here in the
 4  United States and traveling overseas to support them, and
 5  talking about Jihad fighting alongside ISIL.
 6  Q    I want to focus on some specific conversations that they
 7  had.
 8              I want to direct your attention to November 5th
 9  of 2014.  On that day did the defendant discuss the taking of
10  an oath with a confidential human source?
11  A    Yes, he did.
12  Q    And what the defendant -- what did they discuss?
13  A    Discussed an oath of loyalty to the State.
14  Q    When they say the word "State," based on your training
15  and experience, what are they referring to?
16  A    The Islamic State in Iraq and Levant, ISIL.
17  Q    What type of oath?
18  A    An oath of loyalty to the State.
19  Q    The meeting was videotaped; is that correct?
20  A    That's correct.
21              MR. IMPERATO:  Judge, may I approach?
22              THE COURT:  Briefly.
23              MR. IMPERATO:  Thank you.
24  BY MR. IMPERATO:
25  Q    I am going to hand you what's previously marked and

1  admitted as Government's Exhibit 1.  Can you tell the Court

2  what's depicted in Government's Exhibit 1.

3  A   That's Mr. Al Hardan when he took the oath on the Koran.

4  Q   Based on your training and experience, is it common for

5  an individual to pledge their loyalty to a terrorist

6  organization?

7  A   Yes, it is.

8  Q   Speaking of oaths, did the defendant discuss with the

9  confidential human source that he would be required to take

10 an oath if and when he received his citizenship?

11 A   Yes, he did.

12 Q   What did defendant tell the confidential human source

13 about what he would do if he was required to take that oath?

14 A   He said he would not take an oath to an infidel state and

15 that instead he would mumble or say a prayer.

16 Q   Later on that same day on November 5th, 2014, did the

17 defendant and confidential human source discuss weapons

18 training?

19 A   Yes, they did.

20 Q   Who initiated this weapons training?

21 A   Mr. Al Hardan.

22 Q   And was this the first time that the defendant initiated

23 conversation about being trained in weapons?

24 A   No, it was not.

25 Q   What type of weapons training was the defendant

1 requesting?

2 A   He wanted training on a fully automatic AK-47, consistent

3 with what the brothers, the terrorist organizations in the

4 Middle East used.

5 Q   And again, when you say the word "brother" --

6         THE COURT:  Who doesn't use them?

7         THE WITNESS:  Fair enough, sir.  It's a very common

8 weapon.

9 BY MR. IMPERATO:

10 Q   But when he said like the brother use, who was he

11 referring to?

12 A   He was referring to the brother, as we said earlier,

13 ISIL.

14 Q   Did the defendant actually participate in tactical

15 weapons training?

16 A   Yes, he did.

17 Q   When?

18 A   Two days later, on November 7th.

19 Q   And where did this training take place?

20 A   At a farm outside of Houston.

21 Q   Who was present at that training?

22 A   The confidential human source and Mr. Al Hardan.

23 Q   Who requested this training?

24 A   Mr. Al Hardan.

25 Q   What took place at that farm?

1  A    He learned how to --

2  Q    When you say "he," who is "he"?

3  A    Mr. Al Hardan learned how to fire and manipulate the

4  fully automatic AK-47.  He learned tactics such as moving to

5  cover trying to avoid fire, typical combat tactics.

6  Q    Who provided the defendant with this weapon?

7  A    The confidential human source.

8  Q    Was this entire event videoed?

9  A    Yes, it was.

10          MR. IMPERATO:  Your Honor, may I approach?

11          THE COURT:  Why don't you just give him all of them?

12 BY MR. IMPERATO:

13 Q    I am going to ask you to look at Government's Exhibit 2

14 that has previously marked and admitted.  Can you tell the

15 Court what's depicted in Government's Exhibit 2.

16 A    That's a picture of Mr. Al Hardan holding the fully

17 automatic AK-47, standing behind a bearer that he had been

18 using for training for cover.

19 Q    How long did the defendant participate in this training?

20 A    Approximately an hour.

21 Q    Did the defendant indicate to the confidential human

22 source how he wanted to assist ISIL?

23 A    He stated at the time he wanted to be an ordinary

24 fighter.

25 Q    And that meaning what?

1  A   Fighting in the field alongside other ISIL fighters.

2  Q   Did the defendant discuss -- did that change over time?

3  Did he tell the confidential human source how he wanted to

4  assist ISIL in another way?

5  A   Yes, he did.

6  Q   What did the defendant say?

7  A   He wanted to become trained in how to make

8  transmitter/receiver detonators for improvised explosive

9  devices.

10 Q   That will remotely detonate it?

11 A   That's correct.

12 Q   And how did the defendant say he wanted to remote

13 detonate?

14 A   That he would use cell phones.

15 Q   I want to direct your attention to November 20 of 2014.

16 On that day was there another meeting between the defendant

17 and the confidential human source?

18 A   Yes, there was.

19 Q   And at that meeting did the defendant show the

20 confidential human source anything?

21 A   Yes, he did.

22 Q   What did he show him?

23 A   He showed him the progress he had made in learning how to

24 make basic electronic circuitry.

25 Q   Can you look at Government's Exhibit 3 that's been marked

1 and admitted and tell the Court what's detected in that

2 picture.

3 A    This is him demonstrating making that basic circuit.

4 Q    What is the defendant trying to build in this picture?

5 A    He is trying to build a circuit that could be used for a

6 transmitter for a detonator.

7 Q    Did the defendant tell the confidential human source how

8 he was teaching himself or he was training himself to make

9 these remote detonators?

10 A    Yes, he did.

11 Q    What did the defendant say?

12 A    He was accessing online training videos and using other

13 resources through the computer.

14 Q    Who did the defendant say he wanted to build these remote

15 detonators for?

16 A    He wanted to build them for ISIL.

17 Q    For what purpose?

18 A    So they could kill people.

19 Q    Did the FBI corroborate the defendant's statements about

20 how he was training himself?

21 A    Yes, they did.

22 Q    And how did they corroborate the defendant's statements?

23 A    Through search warrants we found that on his computer, he

24 had been accessing websites to find this training.  They also

25 found training CDs in his home.

1  Q   Did the defendant and the confidential human source
2  discuss the defendant committing any violent acts in the
3  United States?
4  A   Yes, they did.
5  Q   Can you tell the Court specifically what did the
6  defendant tell the confidential human source he wanted to do?
7  A   Mr. Al Hardan spoke for the time when he had lived in the
8  Dallas area and he had had access to a military base in the
9  area.
10 Q   Did he say which military base?
11 A   It's a military base in Grand Prairie.
12 Q   Is there a military base in Grand Prairie?
13 A   There is.
14 Q   And what did the defendant say he wanted to do at that
15 military base in Grand Prairie?
16 A   He wanted to go on to the base.  He wanted to use
17 gasoline to set fire and blow up the Humvees.
18 Q   Did the defendant discuss with the confidential human
19 source what other acts he wanted to commit in the United
20 States?
21 A   Yes, he did.
22 Q   What did he tell the confidential human source?
23 A   He said that he wanted to participate in the planning and
24 execution of setting off a bomb in a mall.
25 Q   Did the defendant say specifically which mall or malls he

1 wanted to do this in?

2 A    He mentioned Sharpstown Mall and the Galleria here in
3 Houston.

4 Q    What was the defendant's plan?

5 A    He wanted to plan out how to enter the facilities without
6 being observed, how he would take in a fully assembled
7 device, how he would hide the device specifically in a trash
8 can in the same way it was done with the Boston bombings at
9 the marathon.  Then he would leave and detonate that device
10 remotely using a cell phone.

11 Q    Thank you.

12            Did the defendant tell the confidential human
13 source what would happen if the FBI tried to ever arrest him?

14 A    He stated that he would defend himself and he would not
15 be taken if the FBI or SWAT tried to arrest him for these
16 things he was doing.

17 Q    I want to direct your attention now to a period of time
18 from September of 2015 through December of 2015.  Did the
19 defendant continue to make any unusual purchases that caused
20 law enforcement to be concerned?

21 A    Yes, he did.

22 Q    What did the defendant continue to purchase?

23 A    He continued to purchase electronic components to make
24 circuitry.

25 Q    These are the same electronic components that he

1 previously purchased?

2 A    That's correct.

3 Q    And what else was defendant starting to purchase that was

4 new?

5 A    He also purchased the tools necessary to actually

6 assemble these circuitry.

7 Q    Did this concern the FBI?

8 A    Yes, it did.

9 Q    Why?

10 A    It demonstrated an escalation from simply training and

11 learning to actually being able to execute and build these

12 circuits.

13        THE COURT:  Let's find out how they responded rather

14 than whether they were worried about it.

15        MR. IMPERATO:  Yes, Your Honor.  I will.

16        THE COURT:  "Concerned" is a little wishy-washy.

17        MR. IMPERATO:  I will.  Thank you, Judge.

18 MR. IMPERATO:

19 Q    I want to direct your attention now to October 27th,

20 2015.  Did you meet the defendant on that date?

21 A    Yes, I did.

22 Q    Where did that take place?

23 A    At 126 North Point here in Houston, Texas.  It's the

24 Citizenship and Immigration Services office.

25 Q    Why did you meet with the defendant on that date?

1  A    We brought him in to interview him about inconsistencies

2  in his immigration application.

3  Q    Specifically did you address any particular questions on

4  the N-400?

5  A    Several, yes.

6  Q    Is there one in particular that you focused on?

7  A    Question No. 19.

8  Q    And what was Question No. 19?

9  A    It asks if there is any military, paramilitary or weapons

10  training that the applicant has ever received.

11  Q    Can you tell the Court how you referred to Question 19

12  when speaking with the defendant?

13  A    I made it clear that I was talking in any point in his

14  life, whether he had been overseas or here, and up to that

15  day, October 27th.

16  Q    That what?

17  A    That he had received any kind of weapons training.

18  Q    What was the defendant's verbal response?

19  A    He said no.

20  Q    Is that true?

21  A    It is not true.

22  Q    Why isn't it true?

23  A    The training we have spoken of already where he received

24  training with the AK-47 and tactical training.

25  Q    Did the defendant ever receive his United States

1  citizenship?

2  A   He did not.

3  Q   Did he ever receive a passport?

4  A   He did not.

5  Q   Why didn't he receive a passport?

6  A   The FBI put the procedures in abeyance.

7  Q   Why did the FBI put the procedures in abeyance?

8  A   They did not want him to get his passport.

9  Q   Why didn't the FBI want him to get his -- the defendant

10 to get his passport?

11 A   We believed if he received his passport he would travel

12 overseas and participate in the acts that he had described to

13 the confidential human source.

14 Q   Did he relay what he would do if he received his passport

15 to anyone?

16 A   Yes, he did.

17 Q   Who did he do this to?

18 A   Specifically to family members.

19 Q   Which family members?

20 A   His wife and his mother.

21 Q   I want to direct your attention to October 19th of 2014.

22 On that date did the defendant have a conversation with his

23 mother and wife about what he would do if he received his

24 passport?

25 A   Yes, he did.

1   Q   And I want you to go to Government's Exhibit 4 that's
2   been marked and admitted.  And what is Government Exhibit 4?
3   A   These are excerpts from that conversation.
4   Q   Could you, please, read those excerpts to the Court,
5   please.
6   A   "Once I get the passport, I will leave America, I will
7   leave.  I will make a widow of you.  Mark my words, I
8   wouldn't be Omar if I do not make a widow out of you."
9           MR. ADLER:  Excuse me.  If I could interrupt for a
10  second, Your Honor.
11              Could I ask that the witness identify when the
12  excerpts, when there's a break in the excerpts rather than
13  just reading them as if it was one, long conversation.
14          THE COURT:  Just say "skip" or something.
15          THE WITNESS:  Yes, sir.
16  A   "Once I get the passport, I will leave America, I will
17  leave."
18              Break.
19              "I will make a widow out of you.  Mark my
20  words, I wouldn't be Omar if I do not make a widow out of
21  you.  Just wait until I get the passport.  You will get a
22  phone call with news of my death.  Just wait and see.  I will
23  make you regret every minute you disobeyed me.  I'm just
24  waiting for the passport."
25              Break.

1            "And you'll get a call on the phone about my

2   death.  Mark my words.  You'll get a phone call telling you

3   Omar died."

4            Break.

5            "I will not stay in America.  Once I get the

6   passport, I will go to Syria."

7            Break.

8            "No, no.  I am going to Syria, mother.  I will

9   go to either Syria or Iraq."

10            Break.

11            "I am not wacko.  I am not wacko.  I am

12   speaking the truth.  I will travel to Syria once I get the

13   passport, Iraq or Syria, okay.  I want to blow myself up."

14            Break.

15            "I want to blow myself up.  I want to travel

16   with the Mujahideen.  I want to travel to be with those who

17   are against America.  I am against America."

18   BY MR. IMPERATO:

19   Q   Does the defendant own any property in the United States?

20   A   He does not.

21   Q   Does he own a house?

22   A   He does not.

23   Q   Does he rent a house?

24   A   He rents an apartment.

25   Q   Are the defendant's family members United States

1 citizens?  And when I say that, is his mother a United States

2 citizen?

3 A   She is not.

4 Q   Is his father?

5 A   He is not.

6 Q   Is his brother?

7 A   No.

8 Q   Is his wife?

9 A   No.

10 Q   Does the defendant have any relatives that live outside

11 of the United States?

12 A   Yes, he does.

13 Q   Where?

14 A   In Jordan.

15 Q   Is the defendant in regular contact with them?

16 A   Yes, he is.

17 Q   And what does he communicate with them about, if you

18 know?

19 A   I don't know.

20 Q   Does the defendant provide them with anything?

21 A   He does.

22 Q   What?

23 A   Money.

24 Q   Is the defendant currently being held by any type of

25 detainer?

1  A    Yes.  There is an Immigration and Customs Enforcement

2  detainer in place.

3  Q    What is that?

4  A    What that says is that if he's released from here, he

5  will move over to Immigration and Customs Enforcement custody

6  while his immigration status is adjudicated and determined.

7  Q    Did the defendant complete any classes or training?

8  A    Yes, he did.

9  Q    What classes or training?

10 A    For a concealed handgun license in Texas.

11 Q    Could the FBI prevent him from attending that course?

12 A    No, they could not.

13 Q    After the -- when did the defendant attend that course?

14 A    That was August of 2015.

15 Q    2015.

16                After the defendant attended that course to

17 receive his concealed handgun license, did the defendant

18 attempt to purchase anything?

19 A    Yes, he did.

20 Q    What?

21 A    He attempted to purchase a pistol.

22 Q    Was the defendant successful in purchasing that pistol?

23 A    He was not.

24 Q    How was the defendant prevented from purchasing that

25 firearm?

1  A    The FBI was able to locate an outstanding warrant that he

2  has in Fort Worth and use that to block the sale of the

3  pistol.

4  Q    Does the defendant have access to any firearms?

5  A    Yes, he does.

6  Q    How or who?

7  A    His brother owns a firearm, and he has a very close

8  friend who has a firearm as well.

9  Q    Let's talk about his brother.  Does he have a close

10 relationship with his brother?

11 A    They do.

12 Q    His brother's name is what?

13 A    Saeed.

14          MR. ADLER:  Judge, excuse me.  I am going to object.

15 Unless there is some testimony that my client lives with his

16 brother, I don't know how he would have access to a gun in

17 somebody else's house.

18          THE COURT:  Overruled.

19              You keep saying a "firearm."  What does his

20 brother own?

21          THE WITNESS:  He owns a pistol, sir.

22          THE COURT:  What kind of pistol?

23          THE WITNESS:  I don't know that.

24 BY MR. IMPERATO:

25 Q    It's not a BB gun, is it?

1  A   It is not a BB gun.

2  Q   Did they even speak to the defendant's brother?

3  A   Yes.  He was interviewed on Thursday when Mr. Al Hardan

4  was arrested.

5  Q   Last Thursday?

6  A   That's correct.

7  Q   And what did the brother, Saeed, say about what the

8  defendant told him?

9  A   That the defendant had spoken about traveling to Syria

10 and fighting alongside ISIS, ISIL.

11 Q   You mentioned a friend.  Is this a close friend?

12 A   Yes, they are.

13 Q   What's the defendant's friend's name?

14         THE COURT:  Let's don't.  There is no sense --

15         MR. IMPERATO:  I'm sorry?

16         THE COURT:  -- denigrating him.

17            Do you know who he is talking about?

18         MR. ADLER:  I don't.  But I don't have a problem if

19 we just not use the name for that person's privacy at this

20 point.

21         THE COURT:  Don't use the name.

22 BY MR. IMPERATO:

23 Q   Without saying his name, is he a close friend?

24         THE COURT:  I have crazy friends, too.

25 A   He is a close friend.

1  BY MR. IMPERATO:

2  Q    Was his friend spoken to?

3  A    Yes, he was.

4  Q    And how close was their relationship?  What did he tell

5  the FBI about how close the relationship was?

6  A    They have known each other for many years.

7  Q    What type of topics would they discuss?

8  A    They have spoken about ISIL and martyrdom.

9  Q    What did the defendant say he wanted to do?

10 A    He wanted to fight along ISIL and become a martyr.

11 Q    He told his friend this?

12 A    Yes.

13 Q    And his friend lives very close to where the defendant

14 lives?

15 A    Neighboring apartment complex.

16 Q    Did the defendant, on the day the defendant was arrested,

17 did the FBI execute a search warrant at his residence?

18 A    Yes, they did.

19 Q    And this is an apartment; is that correct?

20 A    That's correct.

21 Q    Where is that apartment located?

22 A    Meadow Glen here in Houston.

23 Q    And when they executed --

24      THE COURT:  What did they find?

25      MR. IMPERATO:  Yeah.  That's what I was getting to,

1 Judge.

2         THE COURT:  What did they find?

3 BY MR. IMPERATO:

4 Q   Let's go through the pictures.  I think that would help

5 you.

6              Go to Government's Exhibit 5.  What did the FBI

7 find, and what's depicted in Government's Exhibit 5?

8 A   These are electronic circuitry components, consistent

9 with our previous conversations, and prayer beads.

10 Q   Government's Exhibit 6.

11 A   These are more components that were found in a different

12 location but also the bedroom, and these are consistent with

13 what he has purchasing in 2014.

14 Q   And then also Government's Exhibit 7.  Can you look at

15 that and tell the Court what's in Government's Exhibit 7?

16 A   These are the tools that he had most recently purchased

17 in order to build the circuitry.  This is a soldering iron

18 and anti-static tweezers.

19 Q   If you could go to Government's Exhibit 8, what's

20 depicted in Government's Exhibit 8?

21 A   These are old cell phones.

22 Q   Where were they found?

23 A   They were found in a bag in a closet in the house, in the

24 apartment.

25 Q   Not in the defendant's room?

1  A    That's correct.

2  Q    But in the house?

3  A    That's correct.

4  Q    And were they cell phones that were currently being used

5  and activated?

6  A    They were in a bag in the closet and as far as I know not

7  being used or activated.

8  Q    And there were other cell phones that were not being used

9  that were also recovered as well?

10 A    That's correct.

11 Q    Just in different locations?

12 A    That's correct.

13 Q    If you could go to Government's Exhibit 9, and what is

14 depicted in Government's Exhibit 9?

15 A    This is Mr. Al Hardan's closet in his bedroom.

16 Q    And what is of particular interest in Government's

17 Exhibit 9?

18 A    First and foremost there is an ISIL flag.  There is also

19 camouflage clothing, and there were other items found.

20 Q    When you say "other items found," is there anything of

21 particular interest that was located in that closet?

22 A    There is what has been described as a "prayer to do

23 list," and on that list he spoke about receiving strength,

24 being able to commit Jihad and becoming a martyr.

25 Q    Was the defendant's computer located in the apartment?

1  A   Yes.

2  Q   On the day of the search warrant?

3  A   That's correct.

4  Q   How do you know it was the defendant's computer?

5  A   That's what everyone who was interviewed said.

6  Q   And it was located where in the apartment?

7  A   The living room.

8  Q   Was the defendant -- I'm sorry.  Was the FBI able to

9  retrieve the search history from that computer?

10 A   They were.

11 Q   And what, if any, videos were revealed searched on that

12 computer?

13 A   A variety of electronic circuitry training.

14 Q   They were particular videos that were also retrieved from

15 the computer; is that correct?

16 A   That's correct.

17 Q   Can you describe for the Court the video that was found

18 on that computer?

19 A   The first video shows a model car that the defendant and

20 other participants loaded with fireworks.  He narrated that

21 this was a car bomb being used in an Iraqi city.  They then

22 lit the firecracker on fire, exploded the car, began cheering

23 and chanted Allah Akbar.

24 Q   What does Allah Akbar mean?

25 A   That God is great.

1  Q   Based on your training and experience, when is Allah

2  Akbar screamed?

3  A   Often times after an attack.

4          THE COURT:  All through the Islamic world --

5          THE WITNESS:  Yes, sir.

6          THE COURT:  -- they use it.  They text and use God

7  in a variety of ways, too.

8          MR. IMPERATO:  When they blow up cars?

9          THE COURT:  Not to my knowledge.  But neither do

10  most the people who say Allah Akbar.  The ones you see on

11  television do, but they don't go film people in a market in

12  Indonesia.

13  BY MR. IMPERATO:

14  Q   This was on the defendant's computer, correct?

15  A   That's correct.

16  Q   Who else was present other than the defendant?

17  A   His father.

18  Q   Where were these items being blown up?

19  A   Inside the residence.

20  Q   He was lighting fireworks off in his residence?

21  A   That's correct.

22  Q   Blowing up model cars.

23          What other type of models was he blowing up?

24  A   He also blew up a model airplane.

25  Q   Did the defendant make any statements in regard to how he

1 felt about his son?

2 A   Yes, he did.

3 Q   What did the defendant say?

4 A   That he did not want to have a child, that he wished his

5 son was dead, and that he wished his wife was sterile because

6 he didn't want any children.

7           MR. IMPERATO:  Your Honor, may I have a moment?

8           THE COURT:  Yes, sir.

9           MR. IMPERATO:  Thank you.

10           Your Honor, the government would pass the

11 witness at this time.

12           THE COURT:  Mr. Adler.

13           MR. ADLER:  Thank you, Judge.

14           If it's okay with the Court, can I question

15 from the table?

16           THE COURT:  If you will use the microphone, yes,

17 sir.

18                    CROSS-EXAMINATION

19 BY MR. ADLER:

20 Q   Special Agent Wittliff, can you hear me okay?

21 A   Yes, sir.  I can.

22 Q   Can you see into the audience from where you are sitting?

23 A   Yes, I can.

24 Q   About how many employees of the Executive Branch would

25 you say are here today?

1  A   A little over a dozen; probably almost two dozen.

2  Q   And they're all working with you on this case?

3  A   Many of them, yes.

4         THE COURT:  Not now.

5  BY MR. ADLER:

6  Q   Do they have other cases that they work on?

7  A   Yes, they do.

8  Q   Just not now?

9         Do you need them here today for something in

10  your testimony?

11  A   No, sir.

12  Q   Just wasting taxpayer money?

13  A   I can't speak to that.

14         THE COURT:  Yes.

15         MR. ADLER:  Thank you, Judge.

16  BY MR. ADLER:

17  Q   All right.  I believe you're the only witness the

18  government is going to call today.  So, obviously, the Judge

19  is going to make his decision in large part on your testimony

20  and your credibility; and so, because of that I have to

21  ask -- and I am not trying to embarrass you -- have you had

22  any disciplinary issues during your career as a law

23  enforcement officer?

24  A   No.

25  Q   And do you have -- before you were with the Department of

1 | State, was there prior law enforcement experience there also?

2 | A   Prior to the Department of State?

3 | Q   Yes, sir.

4 | A   No, sir.

5 | Q   Did you go to college before that?

6 | A   Yes, I did.

7 | Q   And where did you go to school?

8 | A   George Washington University.

9 | Q   That's right.  You told me that.

10 |             I want to go back through your testimony.  I

11 | will try to do it chronologically as you testified.  If you

12 | don't understand any of my questions, please let me know.

13 |             I think you testified that there was some

14 | communication between my client and the gentleman in

15 | Sacramento and that at some point Mr. Al Hardan said that he

16 | had gone to Syria to fight alongside ISIL?

17 | A   Not that Mr. Al Hardan had said that.

18 | Q   Oh, that Mister, the gentleman in Sacramento said that?

19 | A   That's correct.

20 | Q   Did Mr. Al Hardan ever claim to have gone to Syria to

21 | fight alongside ISIL?

22 | A   He did not.

23 | Q   And these electronic components, do you need a special

24 | license to buy these components?

25 | A   No.

1  Q   Could I buy them at Radio Shack, assuming Radio Shack was

2  still around?

3  A   Yes.

4  Q   There is nothing inherently illegal about these

5  electronic components, is there?

6  A   No.

7  Q   In fact, they're used for a wide variety of normal,

8  everyday, nonviolent, non-lethal devices?

9  A   Yes.

10 Q   The Judge mentioned garage door openers.  I won't take

11 you through a list.  But fair to say there is probably dozens

12 of items that use electronic components in everybody's house?

13 A   Yes.

14 Q   Now, did you testify that Mr. Al Hardan bought a number

15 of these items and the FBI was monitoring him as he purchased

16 these items?

17           Was the FBI aware as he was buying them or did

18 they discover it later on after he had bought them?

19 A   I don't know that.

20 Q   But at some point he had purchased electronics, but he

21 didn't have the tools to do anything with them.  Is that your

22 testimony?

23 A   Yes.

24 Q   So there were just electronic components sitting around

25 his apartment?

1  A    No.

2  Q    Well, he didn't have tools to do anything with them,

3  though?

4  A    Except practice.

5  Q    But I thought your testimony was he bought tools to do

6  things with these components?

7  A    That's correct.

8  Q    And you talked briefly about an FBI expert on explosives

9  being consulted and that he felt, he or she felt that these

10  electronic components were in fact components that could be

11  used to make some type of detonator?

12  A    Yes.

13  Q    But then was the FBI expert wrong, because later on I

14  think you talked about cell phones, not electronic

15  components, being used to detonate IEDs?

16  A    I'm afraid I don't understand the question.

17  Q    Okay.

18           At one point I thought you testified --

19           THE COURT:  Was he making his own detonators or were

20  the detonators cell phones or did the cell phones trigger the

21  remote and it triggers the bomb?

22           THE WITNESS:  The last version, sir.  The cell phone

23  is used as a trigger to detonate the detonator.

24  BY MR. ADLER:

25  Q    Okay.  The confidential informant that was used in this

1  case -- I don't want to know his name.  I want to be clear

2  right now I am not trying to reveal his identity.  I would

3  like to know his motivation for working with the Terrorism

4  Task Force.

5  A   I don't know that.

6  Q   Not being paid as far as you know?

7  A   I don't know.

8  Q   Do you know if he's got any history of mental illness?

9  A   I don't know.

10 Q   Nobody bothered to check that out, or you just don't

11 know?

12 A   I just don't know.

13 Q   Are you a lead agent on this case?

14 A   I am not.

15 Q   But you participated in meetings about this case as the

16 investigation was ongoing?

17 A   Yes.

18 Q   Nobody ever said, hey, maybe we should check this

19 informant out to see he's mentally stable that you recall?

20 A   Not that I recall.

21 Q   When I think you talked about the confidential informant,

22 I think you described it as providing training to Mr. Al

23 Hardan.  What qualifications -- let me start that over.

24              Did the confidential informant ever work as a

25 firearms instructor somewhere?

1  A   I don't know.

2  Q   What's the difference between two guys shooting a gun and

3  one guy training another guy on proper firearm techniques, do

4  you know?  Do you know where that line gets crossed?

5  A   I don't.

6  Q   But your testimony was that Mr. Al Hardan and this other

7  guy went out to a farm somewhere and shot a gun?

8  A   And participated in tactical movement training.

9  Q   Does the confidential informant have training expertise

10 in infantry movements or small unit tactics as far as you

11 know?

12 A   I don't know.

13 Q   So it's possible that guy has no training that would

14 allow him to train someone else?

15 A   It's possible.

16 Q   Nobody bothered to ask that either, as far as you know?

17 A   I didn't ask this.

18 Q   Did you hear anybody else ask it?

19 A   No.

20 Q   These conversations that you testified to in which you

21 claim Mr. Al Hardan said he wanted to be an ordinary fighter,

22 were those recorded?

23 A   Yes.

24 Q   Were those spoken in English or another language?

25 A   Another language.

1 Q   And you talked at one point about a November 20th

2 conversation between Mr. Al Hardan and the confidential

3 informant in which the discussion about electronic circuitry

4 came up, and that he said, I think your testimony was that

5 Mr. Al Hardan said he wanted to make circuits for detonators.

6         Do you understand that to be the actual

7 translation of the words he used or is that sort of your

8 impression of what was said?

9 A   That's what I understand.

10 Q   These videos that were accessed on a computer, there is

11 nothing inherently illegal about those, right, the one that

12 was not contraband?

13 A   Correct.

14 Q   Disturbing but not contraband perhaps?

15 A   Correct.

16 Q   Do you know if anybody else accessed that computer?

17 A   I do not.

18 Q   You testified later that the FBI interviewed a close

19 friend who lived nearby and that that close friend had a

20 discussion with Mr. Al Hardan about the fighting in Syria.

21         Do you know if that close friend ever accessed

22 Mr. Al Hardan's computer?

23 A   I do not.

24 Q   Anybody ever ask that close friend if he accessed Mr. Al

25 Hardan's computer?

1  A   I don't know.

2  Q   I think you testified that the confidential informant and

3  Mr. Al Hardan discussed violent acts in the United States

4  supposedly?

5  A   Yes.

6  Q   How was Mr. Al Hardan going to get access to a United

7  States military base?

8  A   I don't know that.

9  Q   Have you ever tried to get access to a United States

10  military base?

11  A   I've been on U.S. military bases.

12  Q   Is it an easy thing to get access to?

13  A   Not necessarily.

14  Q   Is there a time when it is, has been easy to get access

15  to it in your experience?

16  A   I can't speak to that.  I don't know.

17  Q   You don't know if you've ever had an easy time getting on

18  one?

19  A   I've had an easy time because I have access, but that's

20  personal.

21  Q   Do you know of a time when a civilian not employed on a

22  military base has gotten easy access to a military base?

23  A   No.

24  Q   You testified that allegedly Mr. Al Hardan said he would

25  not be taken, arrested alive if he did this bombing of a mall

1  somewhere.  Do you remember that testimony?

2  A   Yes.

3  Q   When he was arrested, did he try to fight you?

4  A   He did not.

5  Q   Try to flee?

6  A   He did not.

7  Q   Have any weapons on him?

8  A   He did not.

9  Q   Was he polite?

10 A   He was.

11 Q   Friendly?

12 A   He was.

13 Q   Insulting?

14 A   No.

15 Q   Threatening?

16 A   No.

17 Q   Were you scared of him?

18 A   I was not.

19 Q   And the sum total -- I want to be clear on this -- the

20 sum total of the "training" that he received was this one

21 hour out on the farm with a guy who you don't know if he has

22 any ability to actually train someone on firearms usage?

23 A   That's the sum total of training on a fully automatic

24 AK-47 that I'm aware of.

25 Q   Now, you testified Mr. Al Hardan does not have a

1  passport?

2  A   That's correct.

3  Q   Of any country?

4  A   That's correct.

5  Q   So, can you leave the United States if you don't have a

6  passport?

7  A   Not legally.

8  Q   Is it easy to leave the United States without a passport

9  in your opinion?

10  A   It can be.

11  Q   How would you leave the United States easily without a

12  passport?

13  A   Mexican border.

14  Q   So you'd go through the desert somewhere, Texas, New

15  Mexico, California and then cross the Rio Grande River into

16  Mexico, right?

17  A   Correct.

18  Q   Can you travel somewhere else?

19          THE COURT:  What about Canada?

20          MR. ADLER:  Sorry.

21  BY MR. ADLER:

22  Q   Can you travel out of Mexico or Canada without a passport

23  as far as you know?

24  A   Not legally.

25  Q   Can you buy a plane ticket without a passport?

1  A    Not an international flight.

2  Q    The discussions that you referenced with the excerpts

3  that you read, did it appear to you some of those were Mr. Al

4  Hardan having a domestic argument with his wife?

5  A    I don't know that.

6  Q    You don't know that?

7  A    (Indicating in the negative).

8  Q    I am going to read you one of the excerpts that you read

9  us, or part of.

10            "I will make you regret every minute you

11  disobeyed me."

12            So he is not talking about ISIL there, is he?

13  A    In that phrase no, I don't believe so.

14  Q    He is not talking about hurting anyone there?

15  A    Just that phrase?

16  Q    Yeah.

17  A    I don't know what he means by "regret."

18  Q    Okay.

19            Not talking about harming the United States at

20  that point?

21  A    I don't know what he means by "regret."

22  Q    But "I will make you regret every minute," was that a

23  YouTube video he made that he said I'm addressing all of

24  America, or was this a phone or some conversation he had with

25  his wife?

1  A   This was a conversation with his wife.

2  Q   So the "you" that he refers to in this excerpt is his

3  wife?

4  A   Yes.

5  Q   Are you married?

6  A   I am.

7  Q   You ever say anything in anger to your wife?

8  A   Sure.

9  Q   And in another one of the excerpts he talks about going

10 to -- one of the places he talks about going to is Iraq.

11 A   Correct.

12 Q   Where was he born?

13 A   In Iraq.

14 Q   So it's his, sort of his home?

15 A   Correct.

16 Q   Can it be difficult sometimes for a foreigner to live in

17 the United States in your opinion?

18 A   Yes.

19 Q   Getting accustomed to how we do things here and the laws

20 here and the FBI's Joint Terrorism Task Force here?

21 A   Yes.

22 Q   Sometimes people get home sick.  Not criminal, right?

23 A   Correct.

24 Q   In this excerpt where he says "I am against America," he

25 didn't say I want to kill Americans.  You didn't read that

1 out of this excerpt, right?

2 A  I didn't read those words, no.

3 Q  Did you cooperate with the government lawyers in

4 determining which excerpts should be used here today?

5 A  No.

6 Q  That was their decision?

7 A  Yes.

8 Q  You think they picked the most important ones or some of

9 the most important ones for their case?

10 A  Yes.

11 Q  So he said, "I'm against America."  He didn't say I'm

12 going to bomb America.  Right?

13 A  He did not say that.

14 Q  He didn't say I am going to shoot Americans?

15 A  He did not say that.

16 Q  He just said "I'm against America"?

17 A  Correct.

18 Q  And you talked about none of his family are citizens;

19 they're all refugees, right?

20 A  Correct.

21 Q  He came as a refugee also, correct?

22 A  Correct.

23 Q  And are you aware now that they've all been evicted?

24 A  I was not.

25 Q  You didn't read or hear or discover during the

1  investigation that since he's been arrested his entire

2  family's been evicted from their apartment?

3  A   No.

4  Q   The relatives in Jordan that you mentioned that he has,

5  what do they do?  What are their jobs in Jordan?

6  A   I don't know that.

7  Q   Could be lawyers?

8  A   I don't know that.

9       MR. IMPERATO:  Objection.

10 BY MR. ALDER:

11 Q   Could be judges?

12 A   I don't know that.

13      MR. IMPERATO:  Objection.

14 BY MR. ADLER:

15 Q   And I think you said even if this Court determines that

16 there are conditions that can be imposed upon him so that he

17 doesn't go anywhere and that everyone else is safe, he's

18 still got to go through immigration custody, right?

19 A   That's correct.

20 Q   Oh.  Did you say that the FBI was aware that he was

21 taking or had signed up to take a concealed handgun license

22 course, but they couldn't stop him from taking that?

23 A   That's correct.

24 Q   So you learned about it before he took the course or

25 after the course?

1  A    I don't know that.

2  Q    So then how do you know you couldn't have stopped him?  I

3  mean, if you knew beforehand, somebody could have gone to the

4  instructor at the school and said, hey, this guy is the

5  subject of an investigation.

6  A    I don't have an answer for that.

7  Q    Okay.  Fair enough.

8        When you testified that you believe he has got

9  access to firearms through his brother and his friend, they

10 both live in other locations than the apartment he used to

11 live in, right?

12 A    Correct.

13 Q    Do you know if Mr. Al Hardan had keys to those apartments

14 to access those firearms?

15 A    I do not know.

16 Q    The friend who was interviewed by the FBI who said he had

17 known Mr. Al Hardan for years, was he arrested?

18 A    He was not.

19 Q    But he admitted to you that he and Mr. Al Hardan had

20 discussed joining ISIL or discussing ISIL?

21 A    That they had discussed ISIL, yes.

22       THE COURT:  And martyrdom.

23       THE WITNESS:  That's correct, sir.

24       THE COURT:  Discussing it, and martyrdom was the

25 earlier testimony.

1  BY MR. ADLER:

2  Q   Again, I think I know the answer to this, but I have to

3  ask, forgive me.  Anything illegal about having old cell

4  phones in your house?

5  A   No, sir.

6  Q   Do you have old cell phones in your house?

7  A   Yes, sir.

8  Q   About how many do you have?

9  A   Two.

10 Q   And the photograph that was introduced as Exhibit 5, do

11 you have it up there?

12 A   Uh-huh.

13         THE COURT:  Please say yes or no.

14         THE WITNESS:  Yes.

15         THE COURT:  Or I don't know.

16 BY MR. ADLER:

17 Q   That photograph was staged by the FBI and the other

18 agents, correct?  That's not how the items were discovered?

19 A   That's correct.  They were laid out.

20 Q   They were laid out by the agents?

21 A   Correct.

22 Q   And the agents chose to put the prayer beads into that

23 picture, right?

24 A   Apparently, yes.

25 Q   Were there any Muslim agents involved in setting up this

1  photograph?

2  A   I don't know.

3  Q   But somebody made the decision to put the electronic

4  components in a picture alongside the prayer beads knowing

5  that Mr. Al Hardan is a Muslim?

6  A   Somebody made the decision to put that in the picture,

7  yes.

8  Q   They didn't put a knife.  Were there knives in the

9  kitchen?

10 A   I don't know.  I wasn't at the house.

11 Q   They didn't put a family photograph alongside the

12 electronic components, did they?

13 A   Correct.

14 Q   They didn't put a T-shirt of his alongside the electronic

15 components?

16 A   Correct.

17 Q   Someone in the government chose to put the Muslim prayer

18 beads alongside the electronic components?

19 A   Yes.

20        THE COURT:  We got that.

21            They put the daytime running light for your car

22 in there, too.

23            And to the right of that, is that a nose hair

24 clipper?  So they put a nose, an automatic nose --

25

1  BY MR ADLER:

2  Q   Is that in fact a nose hair clipper at the bottom of the

3  central right of that photograph?

4  A   Yes, sir, I believe it is, but I don't know.  I don't use

5  a nose hair clipper.

6  Q   Looks like you and I don't use a lot of hair clipping

7  devices.

8  A   That's correct, sir.

9  Q   All right.

10             And then I think your testimony turned to Mr.

11 Al Hardan and his friends blew up a car, a model car in his

12 apartment with firecrackers.

13             With your hands can you indicate how big the

14 model car was?

15 A   (Indicating).

16 Q   About six inches long?

17 A   Not even.

18 Q   And it was done -- is it your testimony it was done

19 inside his apartment?

20 A   That's correct.

21 Q   Did it do any damage to his apartment?

22 A   Not that I could tell.

23 Q   And how many other people were there when this happened?

24 A   I am not certain, but more than two.

25 Q   And has the FBI identified these other model car bombers?

1  A    Only one.  His father.

2  Q    So somewhere out there now on the loose is a model car

3  bomber with firecrackers?

4        THE COURT:  Mr. Adler.

5        MR. ADLER:  Sorry.

6  BY MR. ADLER:

7  Q    And the model plane that was destroyed happened at the

8  same time the model car was bombed with firecrackers or a

9  different time?

10 A    It appears to be a different time.

11 Q    And were any of the electronic components in all of these

12 pictures used to detonate the firecrackers in the model car

13 and the model airplane?

14 A    Not that I'm aware of.

15 Q    They were just lit with a match?

16 A    That's correct.

17        MR. ADLER:  I have nothing further at this point,

18 Your Honor.

19        THE COURT:  Mr. Adler, not everybody in the room has

20 the exhibits, but I think the "blow myself up" need to be,

21 the entire quotation needs to be read.

22        MR. ADLER:  Okay, sir.

23        THE COURT:  "I want to blow myself up.  I want to

24 travel" -- then there's some confusion -- "with the

25 Mujahideen.  I want to travel to be with those who are

1 against America" -- more confusion.  "I am against America."

2          That's the entire quote, the entire quote we

3 have.

4          MR. ADLER:  Actually, Judge, before I pass the

5 witness, can I talk to my client for a second?

6          THE COURT:  Sure.

7          MR. ADLER:  Thanks.

8          (Mr. Adler confers with defendant)

9          MR. ADLER:  Thank you, Special Agent.

10          I have nothing else at this point, Your Honor.

11          THE COURT:  Mr. Imperato.

12          MR. IMPERATO:  Just briefly, Your Honor.

13          THE COURT:  Yes, sir.

14                    REDIRECT EXAMINATION

15 BY MR. IMPERATO:

16 Q   First of all, the prayer beads, they just weren't found

17 somewhere else in the house and put in the picture.  Where

18 were the prayer beads found?

19 A   They were found with the components.

20 Q   So, when they were all laid out, everything that was laid

21 out in Government's Exhibit --

22          THE COURT:  5.

23 BY MR. IMPERATO:

24 Q   -- 5, that was actually all found together?

25 A   That's correct.

1  Q   It's not like it was staged?

2  A   That's correct.

3  Q   And as far as going to the CHL instructor and talking to

4  them, why would a -- why wouldn't a law enforcement officer

5  go to a CHL instructor and inform them of their

6  investigation?

7  A   The investigation is not something that needs to be

8  shared in public.

9          THE COURT:  But that's speculation.  He doesn't know

10 what the FBI reasons are for doing it.

11 BY MR. IMPERATO:

12 Q   You're one of the agents, correct?

13 A   I am, but I didn't participate in the CHL portion of

14 this.

15 Q   Do you know why they decided not to go approach the CHL

16 instructor?

17 A   I do not.

18 Q   As far as the defendant being arrested and him not

19 attacking any agents when he was arrested, where was he

20 arrested, the defendant arrested?

21 A   He was arrested in the offices there for the Citizenship

22 and Immigration Services in a particular office that we were

23 using.

24 Q   What did he think he was there for?

25 A   Another interview for his citizenship status.

1 Q    And how many agents were present when he was arrested?

2 A    There were two in the room and there were several more in

3 the hallway.

4 Q    And as far as the circuits not being able to be assembled

5 without tools, the first set of electronic components that

6 the defendant purchased, could they be assembled without the

7 tools?

8 A    Parts of them could be, yes.

9 Q    Did the tools make it easier for someone to assemble the

10 detonator?

11 A    Make it easier and more complex.

12 Q    In fact, in the picture where the defendant is presenting

13 his breadboard or the circuits to the confidential human

14 source, he assembled that without tools; is that correct?

15 A    That's correct.

16 Q    As far as the computer that's in the defendant's house,

17 who was the only one that used that computer?

18         MR. ADLER:  Objection, Judge.  This is speculation

19 unless the witness is going to testify he was there when the

20 computer was being used.

21 BY MR. IMPERATO:

22 Q    What did the family members tell you about whose computer

23 that was?

24 A    The family members told us it was Mr. Al Hardan's

25 computer.

1    THE COURT:  You asked that the first time.

2    MR. IMPERATO:  Pass the witness.

3    THE COURT:  You may step down.

4    THE WITNESS:  Thank you, sir.

5    THE COURT:  Anything else?

6    MR. IMPERATO:  The government rests, Your Honor.

7    THE COURT:  Mr. Adler.

8    MR. ADLER:  No witnesses, Your Honor.

9    THE COURT:  All right.  Let's take a 15-minute

10   recess.

11

12                   (Recess taken)

13

14   THE COURT:  I will detain Mr. Al Hardan.  I believe

15   that there is what lawyers call "probable cause" to believe

16   that he committed at least one of the three, but in this case

17   all three of the three.

18            There is a presumption that arises under the

19   law that if it's the nature of this offense of terrorism,

20   that that's all I need to decide, that's it automatic, it's

21   everything else.  However, I don't much like automatic laws,

22   so I'll go ahead and make subsidiary findings.

23            Obviously the circumstances charged are fairly

24   serious.  The weight of the evidence is reasonably clear at

25   this juncture.  It actually would be clear and convincing to

the point where you would bind him over to the grand jury to
have them evaluate it, but there are no set of restrictions
that I can conceive that would assure his reliable appearance
in court and sound behavior outside of the court between his
appearances.

He has been here since 2009, so he does not
have a lengthy association with the United States, and nobody
more precise.  He didn't spend all of that seven years and
six years in Houston, he spent some of it in Dallas.

His family is not an asset in this case.  That
his father appears to be watching the toy explosion, the
Court does not consider blowing up toys be a character flaw
as long as you're 14 and under and you're not in the house.

Despite some irresponsible behavior in my early
youth, I never blew up anything in the house.  I did plenty
of other things to irritate my parents.

The family are on welfare.  There is nothing
wrong with being on welfare.  I am not sure why they are, but
his predominant income is the money the United States sends
him to take care of his parents, some of which is then sent
to the other family members in Syria or Jordan, wherever they
were.

He talks a lot about blowing things up and
bombs.  That's okay in America as long as you don't get
specific and take steps to carry it out.

He had connections to Palestine, Iraq, Syria, much heavier than those in the United States. Actually, the family also has no place to live. Presumably they have found some place, but it's not -- there's not a home. There may be a house, but it's not a home.

It is impossible that the senior members of the family, they were not aware of his conservation -- well, there is one with his mother where he talks about it, but I am thinking about all the electronics and that sort of thing. Anybody can own an ISIS flag in America; it's a free country. You could have lots of flags that most people would consider obnoxious.

He has no prospects here. You know, if you were a young government lawyer like Mr. Imperato with a future ahead of you, you'd do everything you could to stay here and preserve that; but if he just drifted in on a Southern Pacific Railway freight train the other day, he's got no ties and no prospects of having ties. His wife and child do not appear to be a tether.

I'm willing to assume he was bluffing about blowing himself up, but people do blow others up to spite their own relatives. Sometimes they blow themselves up, but usually they're less considerate at that and get whatever demons they have satisfied by hurting other people, which is a rather detailed description of what we will call his

character and mental condition.  It's unstable and tends towards violence.

There is nobody to watch him except the probation office, and they can't watch him all the time. Ankle monitors are a wonderful device.  Assuming the person actually wants to do what's right, it helps them from accidentally doing what's wrong.  In many cases they should have return postage on them so that when they flee to another country, they could at least mail us back the monitor; but apparently we don't do that.

Did you know about the Fort Worth warrant?

MR. IMPERATO:  Yes, Your Honor, we did.

THE COURT:  What is it?

MR. IMPERATO:  I believe the defendant got in an altercation in Fort Worth.  It was a misdemeanor admissible warrant.

THE COURT:  For what?

MR. IMPERATO:  For fighting.

THE COURT:  Wait.  You can speak, I think, Mr. Anderson.

MR. ANDERSON:  Fighting or discharging an air gun.

THE COURT:  So disorderly conduct, or something like that in the old days?

MR. ANDERSON:  Yes, sir, Your Honor.  One was disorderly conduct, and one was discharging an air gun.  I

don't remember which one he had the warrant on, but the
warrant was initially issued for not appearing in court.

THE COURT:  Gosh.  Do you know how old the warrant
is?

MR. ANDERSON:  I think the charges were in 2010 or
2011, if I remember correctly, sir.

THE COURT:  So he would have been 19 or so?

MR. McINTYRE:  19, yeah.

THE COURT:  That's an adult statutorily.

There has been no rebuttal of the presumption,
but had there been, I would have made the findings, and I
make them.

So there is a serious risk he'll flee.  There
is nothing I can do that would prevent it or to prevent him
acting out on some of his impulses in the meantime.

Anything else for the government?

MR. IMPERATO:  No, Your Honor.  Thank you.

THE COURT:  Mr. Adler?

MR. ADLER:  One thing, Your Honor.  Mr. Al Hardan
has been held in solitary for the last few days.  I think
there is quite a bit of science now to support the fact that
solitary is not good on a person's emotional state.  He is
going to have to make some serious decisions and have some
serious discussions with me as his case progresses.

So I would ask that the Marshals look into

whether or not he must be kept in solitary, but I would also ask the Court to order that he remain at the Federal Detention Center and not be moved to the Conroe facility because there is apparently a large amount of materials that I am going to have to go over with him, and it would be a little less expensive for the CJA.

THE COURT: Marshal, would you find out why he is in solitary. I am not telling them to take him out. I just want to know.

THE MARSHAL: Your Honor, the reason that he was put in solitary originally was because of the charges, for his own safety.

I spoke with Mr. Adler during the break. We will look into it and see if there is certain accommodations that we can make.

THE COURT: Well, no. I mean, wherever he is held, he gets to see Mr. Adler.

THE MARSHAL: Correct. We will definitely handle that, yes, Your Honor.

THE COURT: But if there are reasons for his own safety or safety of others or whatever, but it has to be real.

THE MARSHAL: Yes, sir.

THE COURT: Not governmental.

THE MARSHAL: Yes, Your Honor.

1          THE COURT:  Mr. Adler, my count was 11 non-essential

2   government employees in the room.  I counted all of you as

3   essential, which was a little generous.  So that was my

4   count.  I think there were 12.  I just didn't catch them all

5   out there.

6                All right.  Anybody else?

7          MR. IMPERATO:  No, Your Honor.

8          MR. ADLER:  No, Your Honor.

9          THE COURT:  All right.

10               Thank you.

11

12

13               (Conclusion of Proceedings)

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATION

2

3

4

5            I, Fred Warner, Official Court Reporter for the

6   United States District Court for the Southern District of

7   Texas, Houston Division, do hereby certify that the foregoing

8   pages 1 through 73 are a true and correct transcript of the

9   proceedings had in the above-styled and numbered cause before

10  the Honorable LYNN N. HUGHES, United States District Judge,

11  on the 13th day of January, 2016.

12            WITNESS MY OFFICIAL HAND at my office in Houston,

13  Harris County, Texas on this the 19th day of February, A.D.,

14  2016.

15

16

17

18

19                           _____
                                     Fred Warner, CSR
20                                Official Court Reporter

21

22

23

24

25